# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ALEXANDER  J. HARRIS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:16-cv-1493-LCB** |
| | } | |
| **LINCOLN NATIONAL LIFE** | } | |
| **INSURANCE CO.,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Lincoln National Life Insurance Co.'s ("Lincoln") and Plaintiff Alexander Harris's cross motions for Summary Judgment. (respectively Doc. 40, & 28), and Lincoln's former motion for summary judgment (Doc. 12) which has now been superseded. This action involves an employer provided insurance policy and is subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA").

Mr. Harris broke his leg and his leg later became infected, would not heal and had to be amputated. He filed a claim under two group accidental dismemberment insurance policies issued by Lincoln. The policies cover accidental dismemberment and exclude coverage where disease was a contributing cause of the loss. Lincoln denied the claim asserting that Mr. Harris's injury

resulted from a bone disease brought on by previous radiation treatment he had undergone to treat cancer.

Mr. Harris filed a two count Complaint against Lincoln including: (i) a claim for dismemberment benefits; and (ii) a claim asserting wrongful withholding of documents related to Lincoln's denial of the dismemberment claim. Both Lincoln and Mr. Harris have each separately moved for summary judgment on both claims. (respectively, Doc. 40, & 28.) Lincoln's recently filed reformatted motion (Doc. 40), replaces its previously filed motion (Doc. 12).

For the reasons stated below, Lincoln's Motion for Summary Judgment (Doc. 12) is due to be **DENIED** as superseded, Lincoln's Reformatted Motion for Summary Judgment (Doc. 40) is due to be **GRANTED,** and Mr. Harris's Motion for Summary Judgment (Doc. 28) is due to be **DENIED**.

## I.    FACTUAL BACKGROUND

### A. The Relevant Insurance Policies

On January 1, 2014, Lincoln issued two insurance policies to Mr. Harris's employer, QinetiQ North America, Inc. ("QinetiQ"). AR 000018, AR 000105.[1] The policies included one identified as "Group Insurance Policy No. 00001018133 Providing Life Insurance Accidental Death and Dismemberment Insurance Dependent Life Insurance," AR 000018, which described itself as providing "Basic

---

[1] Citations to "AR" refer to the Administrative Record.

Life and AD&D Insurance" (the "Basic Policy"), AR 000023. The other policy is titled "Group Insurance Policy No. GL 000403002643 Providing Voluntary Accidental Death and Dismemberment Insurance" (the "Voluntary Policy"). AR 000111.

The Basic Policy provides a dismemberment benefit for accidental injuries. AR 000065. The Basic Policy, however, excludes coverage of those losses that resulted from other contributing causes including disease. AR 000065. The Basic Policy provides in relevant part:

> **DEATH OR DISMEMBERMENT BENEFIT FOR AN INSURED PERSON.** The Company will pay the benefit listed below if:
>
> > (1) an Insured Person sustains an accidental bodily injury while insured under this provision; and
> >
> > (2) that injury directly causes one of the following losses within 365 days after the date of the accident.
>
> The loss must result directly from the injury and from no other causes.
>
> . . .
>
> **LIMITATIONS.** Benefits are not payable for any loss to which a contributing cause is:
>
> > . . .
>
> > (2) disease, bodily or mental infirmity, or medical or surgical treatment of disease.

AR 000065 (underlined emphasis added).

Similarly, the Voluntary Policy provides a dismemberment benefit for accidental injuries. AR 000130. The Voluntary Policy also excludes coverage of those losses that resulted from other contributing causes including disease. AR 000137. The Voluntary Policy provides in relevant part:

**DEATH OR DISMEMBERMENT BENEFIT FOR AN INSURED PERSON.** The Company will pay the benefit listed below if:

(1) an Insured Person sustains an accidental bodily injury while insured under this provision; and

(2) that injury directly causes one of the following losses within 365 days after the date of the accident.

<u>The loss must result directly from the injury and from no other causes.</u>

. . .

**EXCLUSIONS.** <u>No benefit will be paid for loss resulting from:</u>

. . .

(6) sickness, <u>disease</u> or bodily infirmity; except for:

(a) a bacterial infection resulting from an accidental cut or wound; or

(b) the accidental ingestion of a poisonous food substance; . . . .

AR 000130, AR 000137 (underlined emphasis added). The Basic Policy and the Voluntary Policy (collectively, the "Policies") both provided that an insured could recover "1/2 Principal Sum" for the "Loss of One Member" which included the loss of a foot. AR 000065; AR 000130.

The claim procedures for both Policies are included in the respective policy document. *See* AR 000062; AR 000143. Both Policies provide that: "Written notice of an . . . dismemberment claim must be given within 20 days after the loss occurs; or as soon as reasonably possible after that." AR 000062; AR 000143. Once a claim is received, Lincoln was obligated to send a claims form to the claimant so that he could submit the requisite proof of loss. *Id.* The claimant then submits to Lincoln proof of his claim including information that shall "state the nature, date and cause of the loss." *Id.* In addition to the returning the claim, the claimant is required to include other materials that Lincoln "may reasonably require in support of the claim." *Id.*

The Policies, in a section titled, "Company's Discretionary Authority," grant Lincoln the authority to determine a claimant's entitlement to benefit:

> **COMPANY'S DISCRETIONARY AUTHORITY.** Except for the functions that this Policy clearly reserves to the Group Policyholder or Employer, the Company has authority to:
>
> (1) manage this Policy and administer claims under it; and
>
> (2) interpret the provisions and resolve questions arising under this Policy.
>
> The Company's authority includes (but is not limited to) the right to:
>
> (1) establish and enforce procedures for administering this Policy and claims under it;
>
> (2) determine Employees' eligibility for insurance and entitlement to benefits;

(3) determine what information the Company reasonably requires to make such decisions; and

(4) resolve all matters when a claim review is requested.

AR 000064; AR 000145. The Polices require Lincoln to send the claimant written notice of its decision, and, in case of a denial, Lincoln is required to explain "the reason for the denial . . . ;" "how the claimant may request a review of the Company's decision;" and "whether more information is needed to support the claim." AR 000063; AR 000144.

In the Summary Plan Descriptions for each plan, the Policies designate QinetiQ as the Plan Administrator. AR 000107; AR 000166.

## B. Mr. Harris's Accident and Subsequent Treatment

On August 14, 2014, Mr. Harris had an accidental injury. (Doc. 42, p. 3, ¶ 4.) In his Dismemberment Claim Form (signed December 23, 2014), Mr. Harris wrote that: "I was walking in my yard and when I put my foot down my left tibia broke in several pieces." AR 004544.[2] Mr. Harris "went to Huntsville Hospital's emergency room where X-ray films revealed a non-displaced[3] fracture of his left

---

[2] Mr. Harris's Dismemberment Claim form states the date was August 16, 2014. AR 004544. Mr. Harris's Complaint states that the accident occurred on August 14, 2014. (Doc. 1, p. 3, ¶ 8.) The specific date when Mr. Harris's accident occurred has no bearing on the outcome of the Court's decision.

[3] The term "non-displaced" is described as:

tibia." AR 004322. According to Mr. Harris's attorney, Eric Artrip, the hospital's records stated: "'Labs do not reveal evidence of recurrent cancer.'" *Id.* At the hospital, "[Mr. Harris] was placed in a cast and advised to follow up with his physician." *Id.*

- On August 19, 2014, Mr. Harris consulted with Dr. Robert A. Maples. AR 003636. Dr. Maples stated that he would "over wrap [Mr. Harris's] short leg splint into a sort leg cast[,]" and would "discuss the case with Dr. Ginger Holt at Vanderbilt University with regards to treatment options going forward." *Id.* In his progress notes, Dr. Maples wrote: "Mr. Harris is a 45 year-old gentleman who has a history of malignant fibrous histiocytoma[4] in his left leg with radiation and soft tissue coverage <u>who sustained a fall while</u>

---

There are many types of fractures, but the main categories are displaced, non-displaced, open, and closed. Displaced and non-displaced fractures refer to the alignment of the fractured bone.

In a displaced fracture, the bone snaps into two or more parts and moves so that the two ends are not lined up straight. If the bone is in many pieces, it is called a comminuted fracture. In a non-displaced fracture, the bone cracks either part or all of the way through, but does move and maintains its proper alignment.

Carol DerSarkissian (reviewer), *Understanding Bone Fractures – the Basics*, WebMD (Oct. 29, 2017), https://www.webmd.com/a-to-z-guides/understanding-fractures-basic-information

[4] Histiocytoma is defined as: "a tumor containing histiocytes." *Histiocytoma*. Dorland's Illustrated Medical Dictionary (32nd ed. 2012). Malignant fibrous histiocytoma is defined as "any of a group of malignant neoplasms found mainly in soft tissues in middle-aged adults; depending on the tumor location and the classification system, the term is sometimes used synonymously with or as a general term including similar lesions such as atypical fibroxanthoma and dermatofibrosarcoma protuberans. *Malignant fibrous histiocytoma*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012). Neoplasm is defined as: "New growth; tumor." *Neoplasm*, Steadman's Medical Dictionary (5th ed. 1984).

<u>running resulting in a left tibia fracture</u> on 8/14/14." AR 003636 (emphasis added).

- On August 26, 2014, Mr. Harris met with Dr. Holt. AR 002610. Dr. Holt prepared a letter in which she stated: "I am seeing this very pleasant 45-year-old gentleman in consultation at your request for a <u>pathologic</u>[5] fracture of the left tibia secondary[6] to <u>radiation necrosis</u>.[7] Alex's history dates back to 2001 where he had a malignant fibrous histiocytoma resected[8] on 10/08/2001. . . . He had radiation therapy for a total of 60 gray[9] completed on 01/31/2002." AR 002610 (emphasis added). She noted that he had "wound healing issues," but, after undergoing ten surgeries, his wound finally healed. *Id.* She noted that Mr. Harris's x-rays "shows the shattered bone fracture, <u>radiation necrosis</u> . . . ." AR 002610 (emphasis added). She

---

[5] Pathologic is defined as: "Pertaining to pathology; morbid; diseased; resulting from disease." *Pathologic*, Steadman's Medical Dictionary (5th ed. 1984).
[6] The word "secondary" is used to denote the cause of something, the word is defined as "derived from or consequent to a primary event or thing." *Secondary*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).
[7] Radiation necrosis is defined as: "The death of healthy tissue caused by radiation therapy. Radiation necrosis is a side effect of radiation therapy given to kill cancer cells, and can occur after cancer treatment has ended." *Radiation Necrosis*, National Cancer Institute Dictionary of Cancer Terms (available at: https://www.cancer.gov/publications/dictionaries/cancer-terms/def/radiation-necrosis).
[8] Resect means "to remove part or all of an organ or tissue." *Resect*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).
[9] The word "gray" refers to how much radiation Mr. Harris received. The word "Gray" is defined as: "The international system (SI) unit of radiation dose expressed in terms of absorbed energy per unit mass of tissue. The gray is the unit of absorbed dose and has replaced the rad. 1 gray = 1 Joule/kilogram and also equals 100 rad." Radiation Terms and Definitions, Specialists in Radiation Protection (available at: http://hps.org/publicinformation/radterms/radfact79.html).

summarized that, "Overall, [Mr. Harris] has radiation necrosis fracture nondisplaced in the setting of a terrible soft tissue envelope and leg." AR 002611 (emphasis added). "[D]ue to his history of wound-healing issues, Dr. Holt recommended that Mr. Harris avoid any sort of procedure which might result in potential for re-infection. Taking her advice, Mr. Harris opted to proceed with . . . further casting." AR 004322. Dr. Holt wrote: "He will need a prolonged treatment in the cast twice as long if not longer than a regular fracture would be treated in a cast for a tibia fracture. This is due to the radiation necrosis sustained with 60 gray radiation, the bones stripping from multiple surgical procedures, and the time that has lapsed in between." AR 002611 (emphasis added).

- On November 4, 2014, Mr. Harris met with Dr. Krishna Reddy. AR 002613. Dr. Reddy wrote: "He now presents with a fracture of his midshaft tibia, which is relatively undisplaced. This is in the setting of radiation induced osteonecrosis." AR 002613 (emphasis added). Dr. Reddy stated that "the fracture is not yet united . . . ." *Id.* Dr. Reddy wrote, "We feel this fracture is unlikely to go into healing secondary to radiation induced osteonecrosis from his previous treatments of sarcoma."[10] AR 002613 (emphasis added). Dr. Reddy discussed surgical treatment options with Mr.

---

[10] Sarcoma is defined as: "A connective tissue neoplasm, usually highly malignant, formed by proliferation of mesodermal cells." *Sarcoma*, Steadman's Medical Dictionary (5th ed. 1984).

Harris including: posterolateral plating, an ipsilateral vascularized[11] fibular graft and plating, and amputation. *Id.* Mr. Harris opted for a bone graft and plating. *Id.*

- On November 21, 2014, Dr. Holt and Dr. Douglas Welkert performed a bone graft on Mr. Harris. AR 002615. In his Operative Report, Dr. Welkert stated: "ALEXANDER HARRIS is a 45 year old Male presenting with nonunion of the tibia <u>secondary to radiation and previous sarcoma resection of leg</u>." AR 002615 (emphasis added). He went on to write: "The patient's <u>past medical history is significant</u> for a previous sarcoma resection of the left leg. The patient received radiation therapy as a part of his cancer treatment. <u>The patient developed an osteonecrosis of his tibia with subsequent fracture</u> and nonunion." *Id.* (emphasis added).

- In her Operative Report, Dr. Holt described the postoperative diagnosis as: "Pathologic fracture of the left midshaft tibia secondary to <u>radiation osteonecrosis</u> and periosteal stripping following soft tissue sarcoma resection and infection."[12] AR 002617 (emphasis added).

---

[11] Vascular is defined as "Relating to or containing blood vessels." *Vascular*, Steadman's Medical Dictionary (5th ed. 1984).
[12] Periosteal is defined as: "relating to the periosteum." *Periosteal*, Steadman's Medical Dictionary (5th ed. 1984). The Periosteum is defined as "round the bones." *Periosteum*, Steadman's Medical Dictionary (5th ed. 1984).

**C. Mr. Harris Returns to the Hospital and is Admitted at Vanderbilt**

Three days after the surgery, Mr. Harris was ambulatory at the hospital and using a rolling walker. AR 004323. He had fever and pneumonia-like symptoms, nevertheless, he was discharged on November 26, 2014, "with symptoms of fatigue, a low-grade fever and drainage from a prior flap site." *Id.* Mr. Harris had persistent fevers and general feeling of illness; thus, he went to a hospital emergency room. AR 002621; AR 004323. On December 8, 2014, he was then transferred from that hospital to Vanderbilt University Medical Center. AR 002625; AR 004323.

- On December 8, 2014, Dr. William Grantham examined Mr. Harris and drafted a report in which he described Mr. Harris's medical history, "He has history of malignant fibrous histiocytoma that was excised in 2001 and had subsequent radiation therapy from which he had a pathological fracture of his left tibia this year." AR 002621 (emphasis added). In his assessment of Mr. Harris, Dr. Grantham wrote, "Mr. Harris is a 45-year-old man status post a left vascular fibula graft for a tibial pathologic fracture who has a fever of unknown origin." AR 002622 (emphasis added). Dr. Grantham tentatively planned that Mr. Harris be "boarded for irrigation and debridement pending the results of the workup[,]" and admitted Mr. Harris to the Orthopaedic Oncology service. *Id.*

**D. Mr. Harris Undergoes Amputation Procedure**

Upon admission to Vanderbilt, Mr. Harris also met with Dr. Holt. AR 002625. Dr. Holt discussed with him that if he had an infection Dr. Holt would proceed with an amputation. *Id.* Dr. Holt reported that a test revealed that his leg was infected with MRSA. *Id.* On December 10, 2014, Dr. Holt met with Mr. Harris to discuss with him the need to amputate his leg and Mr. Harris consented. That day, Dr. Holt performed a below knee amputation on Mr. Harris's leg. *Id.*

- In her December 10, 2014, Operative Report, Dr. Holt diagnosed Mr. Harris in both her pre and post operative diagnosis as: "Radiation necrosis, nonunion, osteomyelitis, left tibia." *Id.* (emphasis added).

**E. Mr. Harris's Claim and Lincoln's Denial of Benefits**

On December 23, 2014, Mr. Harris signed a Dismemberment Claim Form in which he claimed $57,500 under the Basic Policy and $280,000 under the Voluntary Policy. AR 004544. He wrote that on August 16, 2014: "I was walking in my yard and when I put my foot down my left tibia broke in several pieces. Attempts to repair it were unsuccessful and resulted in amputation of my left leg below the knee." AR 004544. Attached to the form was an Attending Physician's Statement completed by Dr. Holt. AR 004545. In response to the question, "Was the loss caused by an Accident?" Dr. Holt checked the box "No." *Id.* She confirmed that Mr. Harris underwent an amputation procedure. *Id.*

On February 17, 2015, a Lincoln employee contacted Mr. Harris and requested additional medical records, because Dr. Holt indicted that his amputation was not due to an accident. AR 002578. That same day, Lincoln sent Mr. Harris a letter requesting additional information including: medical records, hospital records, CT scan results, MRI results, and office visit notes. AR 004530.

On March 17, 2015, Lincoln sent Mr. Harris a letter again requesting the same additional information. AR 004528. The letter requested that the information be provided within 15 days, and stated that the claim file would otherwise be closed. *Id.* On March 30, 2015, Lincoln sent Mr. Harris a letter stating that his "file is being closed due to insufficient information." AR 004524. Lincoln wrote that if the documentation was later provided, then Lincoln would continue its review. AR 004524.

On April 29, 2015, Mr. Artrip, on behalf of Mr. Harris, sent Lincoln a letter stating, "We are in the process of obtaining all relevant medical records and will provide them to you when received. Please provide a copy of the policy including any and all endorsements and exclusions." AR 004523. On August 18, 2015, Mr. Artrip sent Lincoln a letter including medical records. AR 004321. Mr. Artrip acknowledged that 15 years previously Mr. Harris had been diagnosed with malignant fibrous histiocytoma in his left leg. *Id.* Mr. Artrip stated that Mr. Harris "was functional and disease free" at the time of his injury. *Id.* In his letter, Mr.

Artrip described the accident as Mr. Harris "running across an overgrown vacant lot" and that "[h]e stepped in a hole covered by long grass and broke his leg." AR 004322. On May 7, 2015, Lincoln sent Mr. Artrip copies of the Policies. AR 004521.

Lincoln asked its employee,[13] Fil Castillo, RN, to review Mr. Harris's claim. AR 002580; AR 00189; (Doc. 12, p. 19). Mr. Castillo concluded: "The medical findings indicate that the loss was not caused by an acute accidental injury. The medical findings indicate that the loss was a result of complicated chronic medical conditions i.e. malignant fibrous histiocytoma resection, radiation osteonecrosis, infection, non union fx[.]" AR 000188. Mr. Castillo based his reasoning on the following facts:

- "The medical records indicate that the claimant was chasing his dog and felt a snap in his leg and fell to the ground" AR 000189.

- "Xrays showed a nondisplaced pathological fracture in the setting of the surgical bed and surgical field." *Id.*

- "The 8/26/14 medical records noted that the claimant's pathological fx of the left tibia was secondary to radiation necrosis." *Id.*

---

[13] Lincoln writes in its brief that it "engaged a health care consultant, Fil Castillo, RN, to review this claim." (Doc. 12, p. 19.) Given that Lincoln uses the terms "engaged" and "consultant," one could read this statement and reasonably conclude that Lincoln hired an independent contractor to review Mr. Harris's claim. In fact, Lincoln even argues that its reviewers are "independent." (Doc. 12, p. 19.) Yet, these individuals are admittedly employees (*see id.*), and not independent contractors.

- "The 11/21/14 op report noted that the pathological fx of the left tibia was secondary to radiation osteonecrosis and periosteal stripping following soft tissue sarcoma resection and infection." *Id.*

- "The 2/9/15 [Attending Physician Statement] noted that the left [below knee amputation] loss was not caused by an accident." *Id.*

On September 9, 2015, Lincoln sent Mr. Artrip a letter denying Mr. Harris's claim. AR 002712. Lincoln reasoned that the Mr. Harris's "loss was a result of complicated chronic medical conditions from malignant fibrous histiocytoma resection, radiation osteonecrosis and infection." AR 002713. Lincoln also noted that the denied claim could be reviewed. *Id.*

### F. Mr. Harris Appeals and Lincoln Denies Benefits

On November 6, 2015, Mr. Harris's attorney, Glen Connor, sent Lincoln a letter requesting "documents relevant to [Mr. Harris's] claim, including a copy of your entire claim file . . . ." AR 002709. That same day, Mr. Connor, sent Lincoln a separate letter (characterized as a "second level appeal") appealing Lincoln's initial determination. AR 002683. Mr. Connor sent Lincoln a declaration by Mr. Harris, AR 002686-87, and other medical documents. AR 002688-707.[14]

---

[14] The materials included: Dr. Maples's August 19, 2014, examination notes, AR 002688-89; Dr. Holt's August 26, 2014, and September 23, 2014, examination letters, AR 002690-92; Dr. Reddy's November 4, 2014, examination letter, AR 002693-94; Dr. Welkert's November 25, 2014, Operative Report, AR 002695-96; Dr. Holt's November 21, 2014, Operative Report, AR 002697-98; Mr. Harris's November 21, 2014, Vanderbilt University Medical Center Admitting Form, AR 002699; December 8, 2014, MRI Report signed by Dr. Jake Block, AR 002700; Dr.

In his November 6, 2015, declaration, Mr. Harris stated that his injury occurred on August 16, 2014, because while he was jogging his foot was suddenly stopped by something on the ground and it caused him to fall. AR 000266. He described the events in relevant part as follows:

> In order to capture the dog, I needed to leave my yard and cross a vacant lot adjacent to my yard. . . . The terrain is hard, bumpy and irregular. Because of the weeds and grass and patchy ground, it was very difficult to see exactly where I was stepping.
>
> As I was jogging across the vacant lot, my foot was suddenly stopped. The stop was sufficiently sudden and I was moving sufficiently fast that my momentum caused me to flip and I landed flat on my back. In other words, I tripped. . . . I was immediately in a great deal of pain. I tried to walk and fell again. . . .
>
> To be clear, the break did not happen just because I was walking or running. . . . What caused my injury was the fact that my foot was suddenly stopped and caused a fall. My impression at the time was that I had stepped into a hole. All I know for certain is that my foot stopped and I went down. Whether the break was caused by the sudden stop or the fall I cannot tell, but I do know that the break did not just happen when I took a step, it happened when I tripped, whether in a hole or other obstacle.
>
> I have consistently told my physicians that this is what happened. None of my physicians have ever closely examined or questioned me as to the precise facts of the injury and they never showed me their notes, so I do not know their understanding of how the accident occurred. . . .

---

Grantham's December 8, 2014, examination report, AR 002701-02; a December 8, 2014, RAD Chest Portable exam results report, signed by Dr. John Worrell, AR 002703; a December 8, 2014, RAD Lower Leg Ap/Lateral exam results report, signed by Dr. Katie Harley, AR 002704; Dr. Holt's December 10, 2014, Operative Report, AR 002705-06; and December 10, 2010, consultation notes signed by Pratish Patel (Pharmacist), AR 002707.

> Prior to August 16, 2014 I had not had any problems with my leg since the surgery and treatment in 2001 and 2002. It functioned normally, though I had limited range of motion in the ankle. . . . In short, I was able to use my leg in a normal manner. It was completely healed.

AR 000266-67.

On November 12, 2015, Lincoln responded to Mr. Connor stating that it had received his letter requesting an appeal. AR 002599-600. Lincoln acknowledged that he had sent additional information, and asked him to contact Lincoln immediately if he would be submitting any more additional information. *Id.* Lincoln did not reference Mr. Connor's request that documentation be sent to him. *Id.*

That same day Carla Larimore, an Appeals Senior Claims Examiner for Lincoln, asked Bryan Gall to assign the review of Mr. Harris's claim to a nurse staff member. AR 002601. On December 16, 2016, Nurse Lynn Sucha, whose title is "Disability Nurse Consultant," emailed Ms. Larimore a report. AR 002595, AR 002597. In the report, Nurse Sucha stated that she had received: (i) Dr. Maples August 19, 2014, report, Dr. Holt's August 26, 2014, report, and Dr. Welkert's report. AR 002597. She wrote that:

> The medical records revealed the fracture to be pathologic (related to or caused by disease) due to radiation necrosis in the surgical bed of the prior histocytoma. . . .
>
> . . . The claimant had a histocytoma excision, with radiation therapy, several failed skin flaps, and procedures. Years later the bed of the

histocytoma excision was affected by the radiation therapy it was exposed to, causing the bone to break due to this weakened state.

AR 002597. That same day, Ms. Larimore emailed Nurse Sucha, stating, "On this one, I'm trying to determine if the initial injury in 2014 was a direct cause for the amputation, or if the injury in 2015 was the direct cause." AR 002595. Nurse Sucha responded:

> The fracture in 2014 happened because he had radiation therapy to that site which left the bone in less than normal condition. The word "pathologic" means the fracture was caused by the underlying disease and treatment of that disease that occurred years prior. He simply took a step and bone fractured due to the effects of the prior radiation therapy.

AR 002594.

On December 30, 2015, Lincoln sent Mr. Connor a letter in which it stated that it was denying benefits and that Mr. Connor could request an appeal of the decision. AR 002590-92. Lincoln explained that:

> [T]he prior radiation therapy contributed to the fracture which occurred on August 14, 2014. The medical records revealed that the fracture was pathologic (related to or caused by disease) due to radiation necrosis in the surgical bed of the prior histiocytoma. The fracture occurred in the same site as the prior radiation therapy causing the bone to break due to the weakened state.

AR 002592 (emphasis added).

On February 2, 2016, Mr. Connor sent Lincoln a letter requesting "a copy of the report from the health care consultant upon which you rely to deny benefits."

AR 002588. On February 19, 2016, Lincoln's employees "processed" Mr. Connor's request, but Mr. Connor never received the file. AR 000222.

## G. Mr. Harris Again Appeals and Lincoln Denies Benefits

On February 26, 2016, Mr. Connor sent Lincoln another letter requesting an appeal of Lincoln's prior benefits decision. AR 002422. In his letter, Mr. Connor stated that he had sent Lincoln letters on both November 6, 2015, and February 2, 2016, requesting the materials that Lincoln relied upon in denying Mr. Harris's claim and he had not received a response. *Id.* Mr. Connor, addressing Lincoln's decision, wrote that, "The fundamental error in your analysis is the assertion that the injury was caused because the bone had been weakened. In fact, the injury and amputation were caused by an accident . . . ." AR 002422. He stated that, "The fact that fact [sic] that Mr. Harris was able to engage in normal activity for many years following the event which you claims [sic] resulted in the bone damage demonstrates this fact." AR 002423. On March 1, 2016, Mr. Connor sent a letter to Lincoln submitting a letter prepared by Dr. Holt. AR 002377.

In her letter, dated February 26, 2016, Dr. Holt discounted the sarcoma and radiation as contributing to his infection and amputation concluding that they may have been caused by other factors. AR 002378-79. Her letter states in relevant part:

> Although Mr. Harris has had a significant history of surgery to the leg extending from October 8, 2001 to March 25, 2003 he had gone a significant period of time without any pain, discomfort, or significant issues until this traumatic fracture occurred, to be exact a

12.5 year period of time. It is certainly arguable as to the nature of his fracture and what led to his subsequent amputation. . . .

It [sic] my experience in taking care of patients who have had soft tissue sarcomas and radiation who subsequently have a fracture due to their treatment, they most often have antecedent pain and discomfort prior to fracturing the bone, they are far more often postmenopausal women greater than 55 years of age and their fracture occurs sooner than 12.5 years after treatment. Alex does not fit into any of these categories. Alex's amputation occurred due to a fracture and subsequent infection that occurred remotely from any prior treatment to the limb and the nature of his infection is arguable. . . .

In summary, while Alex has a very remote past history from his soft tissue sarcoma and radiation the remote nature of his fracture, failed cast treatment, prolonged open surgery or [sic] as likely as any other cause to contribute to his infection and subsequent amputation.

AR 002378-79 (emphasis added).

On March 3, 2016, Jarod Ashley, Lincoln's "Senior Claims Examiner, Appeals," called Mr. Connor asking to verify whether Mr. Connor had received the complete file he requested, and whether Mr. Connor would be sending any additional information. AR 000195. On March 9, 2016, Mr. Ashley sent Mr. Connor an email asking for verification of the same information. *Id.* Over two weeks later, on March 25, 2016, Mr. Connor responded stating that he had not received the claim file and that without it Mr. Harris would not know what "additional information would be necessary or appropriate to prove his claim." *Id.*

On March 29, 2016, Mr. Jarrod responded that due to the size of the file he could not email the entire file, but he requested a copy be sent to Mr. Connor and attached 200 pages of medical records to his email. AR 000194.

On April 15, 2016, Mr. Connor responded that he had not received the file and also asked for "the summary plan description and the policy." AR 000194. On April 21, 2016, Mr. Ashley sent an email to Mr. Connor stating that a copy of the complete file would be sent out that day or the following day, and he also stated that he needed a time extension since the deadline for deciding the appeal was approaching. AR 000193. That day, Mr. Connor acknowledged receipt of the email writing "Received. Thank you." *Id.*

On May 6, 2016, Mr. Ashley sent Mr. Connor an email stating that he wanted "to see if you received the file copy request that was sent out a couple weeks ago and confirm if you were planning on sending in any additional medical information . . . ." AR 000192-93. On May 17, 2016, Mr. Ashley again emailed Mr. Connor asking him if he received the file and whether he would be sending additional information. AR 000192. On May 23, 2016, Mr. Connor responded that he had not received any documents. *Id.* On June 3, 2016, Mr. Ashley sent an email to Mr. Connor stating that the file comes as a password protected CD, and asking if he received a package from Lincoln containing a CD. AR 000191. Mr. Ashley

stated that it was mailed twice most recently on April 21, 2016. *Id.* Mr. Connor does not appear to have responded.

On June 14, 2016, Mr. Ashley sent Mr. Connor an email stating that Lincoln was proceeding with the second appeal and if any additional information was sent to Lincoln, then Lincoln would review that information as well." AR 000191. On June 15, 2016, Mr. Ashley sent an email to Mr. Gall asking that Mr. Harris's claim be review be assigned to one of Lincoln's employee nurses for review. AR 000197.

On June 15, 2016, Mr. Gall referred the claim review to Nurse Tina Vrbka. AR 000177. In her review, Nurse Vrbka, next to the reference "Documents reviewed," listed "Dr. Ginger Holt/orthopedics 08/26/14-02/26/16." AR 000170. She did not list Mr. Harris's declaration. *See id.* Nurse Vrbka produced a review in which she concluded:

> The medical findings do not meet the definition of accident and dismemberment. The x-rays also showed that on 08/26/14 that he had a pathological fracture that was non-displaced in setting of his surgical bed and surgical field showing a radiation necrosis fracture of the left leg. The diagnosis on 11/21/14 ORIF that was performed noted a DX's of pathologic fracture of the left mid-shaft tibia secondary to radiation osteonecrosis and periosteal stripping following soft tissue sarcoma resection and injection.

AR 000170. Under the section described as "Rationale with medical findings", Nurse Vrbka wrote, "Claimant was walking in his yard when put his left foot down and broke his left tibia in several places on 08/16/14." *Id.* She also wrote "Dr. Holt:

Letter dated 08/26/14: Consult for claimant, who was chasing dog and felt a snap in is [sic] leg, immediate pain, and fell." *Id.*

On August 4, 2016, Lincoln sent Mr. Connor a letter stating that Lincoln's review was complete and Lincoln was denying Mr. Harris's claim. AR 000173. Lincoln explained:

> The medical findings do[15] support that your client's below the knee amputation was directly related to an accidental injury. Medical information confirmed that Mr. Harris had a pathological fracture that was non-displaced that was non-displaced in setting of his surgical bed and surgical field showing a radiation necrosis fracture of his left leg. . . .

> Mr. Harris' medical information showed that his loss was not caused by an acute accidental injury, but rather the loss was the result to a chronic medical condition.

AR 000175.

### H. Harris Files Suit/Procedural Background

On September 13, 2016, Mr. Harris filed his two count Complaint asserting: (i) a claim for dismemberment benefits; and (ii) a claim asserting wrongful withholding of documents related to the Lincoln's denial of the dismemberment claim. (Doc. 1, p. 4-5.) On October 5, 2016, Lincoln filed its Answer. (Doc. 5.)

On November 17, 2017, Lincoln filed its Motion for Summary Judgment (Doc. 12), on December 18, 2017, Mr. Harris filed a Response in Opposition to the

---

[15] This appears to be a typographical error. In the next paragraph, Lincoln asserts that the injury was not caused by an accident. AR 000175.

motion (Doc. 19), and, on January 25, 2018, Lincoln filed a Reply brief (Doc. 22). On March 5, 2018, Mr. Harris filed his own Motion for Summary Judgment (Doc. 28), and, on March 26, 2018, Lincoln filed a response (Doc. 34).

On December 4, 2018, this Court ordered that the parties resubmit their briefs reformatted in a manner consistent with the undersigned judge's Amended Initial Order. (Doc. 37.) On December 19, 2018, Lincoln filed its Reformatted Motion for Summary Judgment (Doc. 40), and, the next day, Mr. Harris filed his reformatted brief (Doc. 42) in support of his motion. On January 7, 2019, Lincoln and Mr. Harris filed their responses (respectively Docs. 50 & 51), and, on January 14, 2019, they filed their replies (Doc. 54 (Lincoln's reply), Doc. 55 (Mr. Harris's reply)).

## II.    STANDARD OF REVIEW

ERISA does not set out a standard for courts reviewing the benefits of plan administrators or fiduciaries. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, (1989). Consequently, the United States Court of Appeals for the Eleventh Circuit developed a test to review an administrator's decision to deny benefits. *Blankenship v. Metropolitan Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2017).[16]

---

[16] This Court has explained that the typical standard of review used in reviewing motions for summary judgment is inapplicable in the context of the review of a claim for denial of benefits:

> Typically, a motion for summary judgment is due to be granted upon a showing that "no genuine dispute as to any material fact" remains to be decided on the action and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

24

The six-part test described by the *Blankenship* Court when reviewing a plan administrator's benefit decision is as follows:

> (1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3)    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5)    If there is no conflict, then end the inquiry and affirm the decision.

---

56(a); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, "'[i]n an ERISA benefit denial case[,]'" the trial court "'does not take evidence, but, rather evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.'" *Curran v. Kemper Nat'l Servs., Inc.*, No. 04-14097, 2005 WL 894840, at *7 (11th Cir. 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002)). As the Eleventh Circuit has recognized, "the motion that serves 'as [a] vehicle[ ] for resolving conclusively' an ERISA benefits-denial action is not a typical motion for summary judgment." *Prelutsky v. Greater Ga. Life Ins. Co.*, 692 Fed.Appx. 969, 972 n.4 (11th Cir. 2017) (citing *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 n.4 (11th Cir. 2011) (per curiam)). Therefore the standard the Court will apply in this case is the six-step framework summarized in *Blankenship*.

*Garrison v. Lincoln National Life Ins. Co.*, 294 F.Supp.3d 1281, 1293 n.10 (N.D. Ala. 2018) (Coogler, J.) (brackets in original).

(6)    If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355 (emphasis in original).

## III.    ANALYSIS

The Court now analyzes the parties' motions as they related to Mr. Harris's claims: (i) a claim for dismemberment benefits; and (ii) a claim asserting wrongful withholding of documents related to Lincoln's denial of the dismemberment claim.

### A. Claim for Wrongful Denial of Dismemberment Benefits

Lincoln argues that examining its decision to deny dismemberment benefits under the first step, the decision was *de novo* correct. (Doc. 40, p. 34, 36-43.) Mr. Harris argues that Lincoln's decision was wrong, because:

(i) the decision failed to consider his declaration in which he stated how he was injured (Doc. 51, p. 20; Doc. 42, p. 10);

(ii) the medical records "corroborate[]" that his fall was the cause of his break (Doc. 51, p. 20 (citing AR 003636));

(iii) two nurse reviewers "were either never informed of Mr. Harris [sic] testimony or ignored it[,]" (Doc. 51, p. 20; *see* Doc. 42, p. 10);

(iv) Dr. Holt "never closely questioned him about exactly how the break occurred[,]" and Mr. Harris was "never offered the opportunity to correct any

errors which might exist in the medical records as to the sequence of events the [sic] led to or caused the accident[,]" (Doc. 51, p. 20-21);

(v) Dr. Holt "confirmed" that "the leg was amputated due to the break and not prior treatment . . ." (Doc. 42, p. 10); and

(vi) "Lincoln is wrong as a matter of law regarding the interpretation of the policy." (Doc. 51, p. 25; *see* Doc. 42, p 10-11.)

The Court shall first discuss how it shall interpret the preexisting condition exclusion included in the Policies prior to analyzing the parties' arguments directed towards the six-part *Blankenship* test reviewing Lincoln's decision.

### i. *Substantially Contributed Test Applies to the Policies*

The Eleventh Circuit in *Dixon v. Life Ins. Co. of N. Am.*, 389 F.3d 1179, 1183-84 (11th Cir. 2004), explained how courts should interpret language in a policy that precludes recovery for an accidental injury where a preexisting condition was a contributing factor. The *Dixon* Court adopted the "substantially contributed" test and required that preexisting conditions "substantially contributed" to an injury or loss to preclude recovery. *Id.* at 1184.

In *Dixon*, the defendant insurance company had issued an insurance policy that provided accidental death benefits to the plaintiff's husband who died of heart failure during an auto accident. *Id.* at 1180-81. The policy included exclusionary language that precluded coverage resulting from "sickness, disease, or bodily

infirmity[,]" and the insurance company denied the plaintiff's claim for benefits stating that the decedent's death "was not 'caused by an accident' but resulted from 'other causes.'" *Id.* at 1180. The plaintiff's retained cardiologist stated that the automobile accident caused the stress that "directly and accidentally" caused the decedent's death. *Id.* at 1181. The district court granted the insurance company's motion for summary judgment concluding that the policy's language unambiguously precluded recovery. *Id.* at 1182.

The Eleventh Circuit, examining the issue of whether "language in an ERISA policy may preclude recovery for accidental injury where some preexisting condition was a contributing factor[,]" explained:

> The coverage provided under the [Life Insurance Company of North America] policy at issue would be rendered almost meaningless if we were to adopt the strict interpretation advanced by Appellee. As the Fourth Circuit rightly pointed out, an overly strict interpretation of "directly and from no other causes" would provide insureds, or their beneficiaries, with coverage only where the insured was in perfect health at the time of an accident. The "substantially contributed" test gives this exclusionary language reasonable content without unreasonably limiting coverage. And, it advances ERISA's purpose to promote the interests of employees and their beneficiaries. *See Firestone*[ *Tire & Rubber Co. v. Bruch*], 489 U.S. [101,] 113, 109 S.Ct. [948,] 956[ (1989)].

*Id.* at 1184. The *Dixon* Court adopted the "substantially contributed" test, but found that plaintiff's husband's pre-existing condition "substantially contributed" to his death and affirmed the district court judgment. *Id.* at 1184-85.

The Eleventh Circuit, in *Bradshaw v. Reliance Standard Life Ins. Co.*, 707 Fed.Appx. 599, 600 & 610 (11th Cir. 2017), applying the substantially contributed test, found that an insurance company unreasonably denied long-term disability benefits in claiming that the insured's healthy pregnancy qualified as a pre-existing condition that "contributed to" the insured's stroke. In *Bradshaw*, the plaintiff was a few weeks pregnant when she bought a long-term disability insurance policy from the defendant insurance company. *Id.* at 601. The insurance policy excluded coverage where a disability was caused by a pre-existing condition, defined to include "Sickness" which in turn was defined to include pregnancy. *Id.* at 602. Prior to giving birth, the plaintiff was diagnosed with "mild preeclampsia," and after giving birth, she had a stroke; as a result, she filed an application for disability benefits. *Id.* at 601. The defendant denied the plaintiff's claim asserting that her disability from the stroke resulted from a "pre-existing condition" from which she received treatment, namely, the pregnancy. *Id.* at 602.

The district court granted summary judgment in favor of the insurance company. *Id.* at 603. The *Bradshaw* Court observed the *Dixon* Court adopted the "substantially contributed" test. *Id.* at 608. The *Bradshaw* Court stated that drawing a connection between the plaintiff's healthy pregnancy and the disabling condition required one to create four links (the (1) pregnancy led to (2) high blood pressure, which in turn led to (3) preeclampsia, which in turn led to a (4) stroke)

which was too attenuated. *Id.* at 610. Thus, the *Bradshaw* Court held that the defendant's use of the pre-existing condition exclusion to deny benefits was unreasonable. *Id.*

The policies at issue in the case before the Court contain pre-existing condition exclusions, *see* AR 000065, AR 000130, AR 000137, similar to those in the policies in the *Dixon* and *Bradshaw* cases. Thus, in light of *Dixon*, the Court shall apply the substantially contributed test in interpreting the policies.

### ii. First Step of the Blankenship Test, De Novo Review of the Lincoln's Decision

In reviewing the administrator's denial of dismemberment benefits, the Court must first determine whether the administrator's denial is "wrong." *Blankenship*, 644 F.3d at 1355. The Eleventh Circuit further explained that:

> A decision is "wrong" if, after a review of the decision of the administrator from a *de novo* perspective, "the court disagrees with the administrator's decision." *Williams*[ *v. BenllSouth Telecomms., Inc.*], 373 F.3d [1132,] 1138 & n. 8[ (11th Cir. 2004)]. The court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator.

*Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (emphasis in original). This Court has observed that "Courts have found that an administrator is 'wrong' where it 'disregarded the unanimous medical opinions' of treating physicians." *Pickert v. Reliance Standard Life Ins. Co.*, No. 5:13-cv-2222-TMP, 2015 WL 12697726, at *8 (N.D. Ala. Jun. 9, 2015) (Putnam, M.J.) (quoting

*Gharagozloo v. Aetna Life Ins. Co.*, No. 08-23349-CIV, 2009 WL 3753589, *15 (S.D. Fla. Nov. 5, 2009)).

The Eleventh Circuit explained, albeit in an unpublished decision, that a court conducting the *de novo* review "applies the terms of the policy." *Ruple v. Hartford Life and Acc. In. Co.*, 340 Fed.Appx. 640, 611 (11th Cir. 2009). This Court also stated that in determining whether an administrator is correct in denying benefits, "this court begins with a review of the [p]olicy itself, since an ERISA plan administrator must discharge its duties 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]'." *Hillyer v. Hartford Life and Acc. Ins. Co.*, No.2:09-cv-00843-JHH, 2011 WL 925027, at *13 (N.D. Ala. Jan. 31, 2011) (Hancock, J.) (quoting 29 U.S.C. § 1104(a)(1)) (second bracket in original).

Lincoln's Policies limit its coverage for dismemberment claims to situations where the insured's loss is caused by an accident, and there are no other factors that contribute to causing the loss. *See* AR 000065; AR 000130; AR 000137. In light of *Dixon*, 389 F.3d at 1184, the Court construes this provision as precluding recovery where factors, other than the accident, "substantially contribute" to the loss. In other words, if a disease substantially contributed to the Mr. Harris's loss, then Lincoln would be correct in denying Mr. Harris's claim under the Policies.

The Court now turns to the administrative record to examine Mr. Harris's treating physician's opinions. This Court has previously observed:

> Courts have held that a treating physician's opinion cannot be discounted or ignored. *See Wilson v. Walgreen Income Protection Plan*, 942 F. Supp. 2d 1213 (M.D. Fla. 2013). As that court noted, it is "unreasonable for an administrator to 'arbitrarily' reject clear medical evidence, including the opinions of a treating physician." 942 F. Supp. 2d at 1251, *citing Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L.Ed. 2d 1034 (2003).

*Pickert*, 2015 WL 12697726, at *8.

According to Mr. Harris, his leg broke while he was running outside; specifically, his "foot was suddenly stopped and caused a fall." AR 003636. Mr. Harris's description of his accident describes the circumstances of how he fell and broke his leg. The Eleventh Circuit has found that an insurer's preference for medical opinions based on objective over subjective medical evidence is not unreasonable. *Doyle v. Liberty Life Assurance Company of Boston*, 542 F.3d 1352, (11th Cir. 2008) ("We do not believe . . . that [the insurance company's] preference for medical opinions grounded on objective medical evidence is somehow indicative that its decision was unreasonable . . . ."); *see also Hillyer*, 2011 WL 925027, at *19 (finding that insurance company's reliance on objective medical evidence over plaintiff's subjective reports was reasonable.). Mr. Harris does not claim to be physician. His declaration, therefore, lacks the medical authority to negate the possibility that other medical factors (such as a disease) may have

played a substantial role in causing in his leg to break. Thus, to the extent that Mr. Harris's relies on his own declaration to conclusively demonstrate the medical causation of his loss (*see* Doc. 51, p. 19-21, 24, 29; Doc. 42, p. 10, 12, 13) contradicting objective medical evidence, his argument lacks persuasive force.

If the fracture of Mr. Harris's leg, which occurred when he fell, was not substantially affected by disease, then Mr. Harris should be able to recover dismemberment benefits. The Court turns to the Administrative Record and, in particular, the opinions of Mr. Harris's treating physicians.

- On August 19, 2014, shortly after Mr. Harris's accident Dr. Maples reported on Mr. Harris's history of histiocytoma with radiation treatment and noted that Mr. Harris sustained a fall "while running resulting in a left tibia fracture . . . ." AR 003636. Dr. Maples's report identifies the cause of the fracture as the fall, and although he was aware of Mr. Harris's prior treatment he did not diagnosis any existing disease as causing Mr. Harris's fracture.

- Yet, Mr. Harris's other doctors repeatedly stated that his fracture was caused by the radiation necrosis. Dr. Ginger Holt reached this conclusion in her August 26, 2014, consultation notes, AR 002610-11; Dr. Reddy also noted the same conclusion in his November 4, 2014, notes, AR 002613; Dr. Welkert stated this conclusion in his November 21, 2014, post-operative

report, AR 002615; Dr. Holt again stated the same conclusion in her November 21, 2014, post-operative report AR 002617; and Dr. Grantham stated the same finding in his December 8, 2014, notes AR 002621.

- In her February 26, 2016, letter, Dr. Holt appeared to backtrack on her unequivocal conclusion that Mr. Harris's fracture was caused by radiation necrosis. *See* AR 002378-79.[17] Dr. Holt in essence reaches no true conclusions, she states that it is possible that his fracture was caused by radiation necrosis, and that possibility is just "as likely as any other cause . . . ." *Id.* The letter, upon which Mr. Harris places great weight, does not state that his trip and fall was the singular "substantial cause" of his loss. *See id.* The letter does not state that radiation necrosis was only a minor cause or, in other words, a cause that was not substantial. *See id.* Instead, Dr. Holt states that factors, such as the radiation necrosis, are just as likely as the fall to contribute to his loss. *Id.*

From the record, it is clear that Mr. Harris's leg accidentally broke, but his doctors overwhelmingly concluded that that the cause of his loss was a pre-existing weakness in his leg that developed from radiation therapy.[18] Dr. Maples's early

---

[17] Mr. Harris contends that Dr. Holt "confirmed" that "the leg was amputated due to the break and not prior treatment . . ." (Doc. 42, p. 10). Mr. Harris's characterization of the facts is not supported by the administrative record, *see* AR 002378-79, and needs not be addressed further.

[18] Lincoln also notes that it utilized three nurses to review Mr. Harris's medical records and it "relied" on their conclusions in its denial of benefits. (Doc. 40, p. 40.) The Eleventh Circuit observed that it is not unreasonable for an insurer to rely on "independent medical opinions or in

diagnosis of Mr. Harris's condition conflicts with the diagnosis of subsequent doctors, Dr. Reddy, Dr. Welkert, Dr. Grantham, who all benefited from greater knowledge about Mr. Harris condition. Dr. Holt's inconclusive letter does not negate the fact that radiation necrosis could have been a substantial cause. Moreover, her letter conflicts with her earlier conclusive diagnosis of Mr. Harris's condition. Mr. Harris fails to provide a basis for ignoring or discounting Dr. Reddy's, Dr. Welkert's, and Dr. Grantham's opinions. Thus, Mr. Harris's argument to the extent it relies on Dr. Maples's progress notes (*see* Doc. 51, p. 20-21 (citing AR 003636)), and Dr. Holt's February 26, 2016, letter (Doc. 51, p. 22

---

crediting those opinions over the opinions of [the insured's] doctors." *Blakenship*, 644 F.3d at 1356. The Court, however, chooses not to rely on these consulting nurses in reviewing the cause of Mr. Harris's loss, because as employees of Lincoln they had no incentive to provide an independent medical review of his claim.

Lincoln acknowledges that these nurses were Lincoln employees, but also argues that they were independent. (Doc. 54, p. 15.) Lincoln provided a declaration of Thomas Vargo, Lincoln's Director of Risk. (Doc. 46-1.) In his declaration, Mr. Vargo asserts that: Lincoln maintains its life claims department and appeals unit as separate and independent entities[;]" "Each decision-maker in Lincoln's appeals unit is charged with making an independent assessment of the adverse benefits determination based on the relevant provisions in the governing policy and upon all of the information submitted, considered, and generated during the claims process[;]" Lincoln "does not compensate claims and appeals department employees based on the outcome of claims, in order to reduce potential bias, promote accuracy and ensure a full and fair review of life/AD&D claims[;]" "Lincoln does not provide financial or other incentives to its employees to deny or close claims[;]" "Employees in Lincoln's claims and appeals units are paid fixed salaries and they may be eligible for an annual bonus[;]" "Annual bonuses are based on the overall financial performance of Lincoln and its related entities for all areas of Lincoln's business[;]" "The consulting nurses are not given any authority to make claims decisions." (Doc. 46-1, p. 2-3.)

Lincoln, however, provides no authority that such working conditions make a Lincoln employee independent of Lincoln. (*See* Doc. 54, p. 15.) To the contrary, these consulting nurses are admittedly Lincoln employees and their compensation is structured in such a way to encourage them to recommend the denial of claims. Given that their bonuses are based on the overall financial performance of the company, they have an incentive to deny benefits that the company would pay out so that Lincoln will have a better financial performance.

(citing AR 002378), 23-24, 28-29; Doc. 42, p. 13-14) fails to demonstrate that Lincoln's decision was *de novo* wrong in light of the countervailing opinions of Mr. Harris's other treating physicians.

Viewing the record as a whole, the Court lacks a basis to conclude that on this evidence Lincoln was wrong when it denied Mr. Harris's dismemberment claim, because his pre-existing radiation necrosis was, according to his treating physicians, a substantial cause of his loss.

Mr. Harris argues that the Lincoln's decision was wrong, because Lincoln's nurse reviewers "were either never informed of Mr. Harris [sic] testimony or ignored it." (Doc. 51, p. 20.) Mr. Harris asserts that Lincoln did not provide Mr. Harris's "testimony" to its employee reviewer, because (1) the manner in which Nurse Sucha and Nurse Vrbka described Mr. Harris's accident differs from the manner in which Mr. Harris described his accident; and (2) Nurse Vrbka did not list his declaration in her review. (Doc. 51, p. 20.)[19]

---

[19] In her Clinical Response, Nurse Sucha wrote: The records indicate the claimant took a step and heard a snap, and then fell. This describes a pathologic fracture." AR 002597. In her Clinical Review, Nurse Vrbka wrote: "Claimant was walking in his yard when put his left foot down and broke his left tibia in several places on 8/16/14." AR 000170. These statements are consistent with Mr. Harris's own initial description of his injury, and Mr. Harris is correct that these descriptions do not reflect his description of his injury as he described it in his declaration. *See* AR 000266-67. These inaccuracies do create the appearance that Nurses Sucha and Vrbka did in fact fail to review his declaration.

In her Clinical Review, Nurse Vrbka, did not list Mr. Harris's declaration as a document that she reviewed. AR 000170. Regardless, the record demonstrates that Lincoln asked Nurse Vrbka to: "Please summarize the <u>medical</u> information reviewed and state your findings." AR 000179 (emphasis added). Plaintiff's declaration does not constitute medical information. Thus,

The Court in performing a *de novo* review of the medical evidence did not provide any weight to the opinions of Lincoln's employee reviewers. Thus, their lack of review of that declaration has no impact on the Court's *de novo* review of Mr. Harris's medical record with respect to the first step of the *Blankenship* test.

Mr. Harris argues that Lincoln's decision was wrong, because Dr. Holt "never closely questioned him about exactly how the break occurred[,]" and he was "never offered the opportunity to correct any errors which might exist in the medical records as to the sequence of events the [sic] led to or caused the accident." (Doc. 51, p. 20-21.) Assuming this is true, Mr. Harris's argument fails to identify how Lincoln's denial of benefits was "wrong" in light of Dr. Holt's alleged failure to question him about the circumstances of his break or her alleged failure to permit him to correct errors in medical records. To the extent that Mr. Harris believes that Dr. Holt failed to adequately diagnosis him, Mr. Harris was certainly free to retain other medical providers and submit that evidence to Lincoln in support of his claim. Moreover, the record shows that Mr. Harris informed his medical providers as to the circumstances of his accident. AR 000266-67 ("I have consistently told my physicians that this is what happened."). Given that he informed his physicians as to the circumstances of his accident, it is reasonable that

Nurse Vrbka would not have been required to identify the declaration in her review if she did in fact review it.

Dr. Holt would not need to question Mr. Harris as to how his accident occurred. Furthermore, Mr. Harris provides no legal basis for his argument that his medical providers should have permitted him to correct medical records regarding the causation of his loss. Mr. Harris does not contend to be a medical provider and appears to have no professional training which would give him a basis upon which he would be professionally justified to correct the medical opinions of his treating physicians. Finally, Mr. Harris does not explain how the particular circumstances of Mr. Harris's leg fracture, whether it was from putting his foot down or having it stop suddenly, would alter his treating physicians' findings that the leg fracture was caused by radiation necrosis.

Mr. Harris also argues that "Lincoln is wrong as a matter of law because it relies upon the underlying suggestion that the injury must be the 'sole cause' of the injury for benefits to be paid." (Doc. 51, p. 25-27; *see* Doc. 42, p 10 (citing *Bradshaw*, 707 Fed.Appx. at 606-07; *Dixon*, 389 F.3d at 1183).) As discussed above, *Bradshaw* and *Dixon* stand for the proposition that the courts should employ a substantially contributed test in interpreting policy provisions that exclude coverage for preexisting conditions. *Dixon*, 389 F.3d at 1184; *Bradshaw*, 707 Fed.Appx. at 608. Those cases did not hold that a court must find an insurer's benefits decision to be "wrong" in a *de novo* review where the court finds that an insured's preexisting condition substantially contributed to his loss. *See Dixon*, 389

F.3d at 1184-85 (reviewing insurer's denial of benefits, the Eleventh Circuit employed the substantially contributed test, which the insurance company failed to employ, the Eleventh Circuit, however, still found insured's preexisting condition precluded recovery of benefits).

### iii. Second and Third Steps of the Blankenship Test, Whether Lincoln's Decision Was Reasonable

Assuming *arguendo*, that Lincoln's denial of dismemberment benefits was wrong, summary judgment is still due to be granted to Lincoln and denied to Mr. Harris, because Lincoln's decision was reasonable. The Court proceeds to analyze the parties' arguments under the second and third steps of the *Blankenship* test.

If the Court finds that the administrator's decision is *de novo* wrong in denying benefits for a claimant, then the Court is required to review that denial for "reasonableness" under an arbitrary and capricious standard if the administrator was vested with discretion in reviewing claims. *Blankenship*, 644 F.3d at 1355. The Policies expressly grant Lincoln discretion in reviewing a claimant's claim for benefits. *See* AR 000064; AR 000145; *see Garrison*, 294 F.Supp.3d at 1284 & 1296 (finding that similar language granted insurance company discretion in reviewing claims for benefits and applying "arbitrary and capricious standard). Therefore, assuming, for sake of argument, that Lincoln's denial of benefits to Mr. Harris was wrong, the Court examines whether that denial was reasonable.

Under the third step, the Court determines "whether 'reasonable' grounds supported [Lincoln's decision] (hence, review [the] decision under the more deferential arbitrary and capricious standard)." *Blankenship*, 644 F.3d at 1355. This Court has described the arbitrary and capricious standard of review:

> Under arbitrary and capricious review, "the plan administrator's decision to deny benefits must be upheld so long as there is a 'reasonable basis' for the decision." *Oliver v. Coca–Cola Co.*, 497 F.3d 1181, 1195 (11th Cir. 2007), *reh'g granted and partially vacated on other grounds*, 506 F.3d 1316 (11th Cir. 2007), *quoting Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1140 (11th Cir. 1989). That is, "this Court's role is limited to determining whether [Hartford's] interpretation was made rationally and in good faith—not whether it was right." *Guy v. Southeastern Iron Workers Welfare Fund*, 877 F.2d 37, 38 (11th Cir. 1989). The determination of the plan administrator "need not be the best possible decision only one with a rational justification." *Griffis v. Delta Family–Care Disability Plan*, 723 F.2d 822, 825 (11th Cir. 1984).

> If a reasonable basis exists for the decision made by Hartford, "it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." *Jett v. Blue Cross & Blue Shield, Inc.*, 890 F.2d 1137, 1138 (11th Cir. 1989); *see also Sharron v. Amalgamated Ins. Agency Servs., Inc. .*, 704 F.2d 562, 564 (11th Cir. 1983) ("[A] court should enforce a decision of pension fund trustees even though the court may disagree with it, so long as the decision is not arbitrary and capricious."). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Retirement Plans*, 887 F.2d 689, 693 (6th Cir. 1989), *quoting Pokratz v. Jones Dairy Fa*rm, 771 F.2d 206, 209 (7th Cir.1985).

*Hillyer*, 2011 WL 925027, at *18 (brackets in original).

Lincoln argues the decision was supported with "reasonable" grounds (Doc. 40, p. 43-47).[20] Mr. Harris responds that Lincoln's decision was "unreasonable," because it "failed to take into consideration how the injury occurred[,]" and Lincoln's medical reviewers "treated the opinion of Harris [sic] physician with similar disregard." (Doc. 51, p. 21-22.) Mr. Harris also argues that Lincoln "failed to give its medical reviewers relevant evidence to consider . . . ." (Doc. 51, p. 25.)[21]

In light of the analysis above, the Court finds that Lincoln was not unreasonable in giving more credence to the opinions of Dr. Reddy, Dr. Welkert, and Dr. Grantham, than it did to Dr. Maples or to Dr. Holt's inconclusive letter. Lincoln's reliance on the opinions of these physicians does not constitute a failure on Lincoln's part to consider how the injury occurred or a demonstration of disregard to Mr. Harris's declaration of his other physicians. Mr. Harris fails to demonstrate why Lincoln's reliance on these opinions over the opinion of Dr. Maples and the indecisive opinion of Dr. Holt is at all "unreasonable" as either a practical matter or as a matter of law.

---

[20] Lincoln also argues that examining the decision under the fourth through sixth steps, Lincoln did have a conflict of interest, but there was a reasonable basis for the decision (Doc. 40, p. 47-49). The Court does not reach this step of the *Blankenship* test, and does not address this argument.

[21] With respect to the fourth step of the *Blankenship* test, Mr. Harris argues that Lincoln has a conflict of interest in that its medical reviewers were employees, and that Lincoln was acting in its own "self-interest" by not providing Mr. Harris with "the medical reviews which were the basis of the denial of the claim even [sic] they were relied upon and considered during the course of the appeal." (Doc. 51, p. 28-29.) Mr. Harris also argues that: "Lincoln's decision-making process demonstrates significant evidence of procedural unreasonableness which justifies the court giving significant weight to the conflict of interest." (Doc. 42, p. 11.) The Court does not reach these arguments which are directed to fourth *Blankenship* step.

Mr. Harris argues that Lincoln's failed to provide its employee reviewers with his declaration or Dr. Maples's opinion. (Doc. 51, p. 21-22.) Mr. Harris's argument relies upon an unproven factual assumption that Lincoln did not provide its reviewers with his declaration or Dr. Maples's opinion. The failure of Lincoln's employees to recite the facts of how Mr. Harris broke his leg, consistent with the manner he provided in his declaration, *see supra* n. 16; AR 002597; AR 000170, did, however, demonstrate a lack of diligence on the part of Lincoln and its employees to review that declaration. Yet, his declaration could not be construed to demonstrate persuasive evidence of medical causation worthy of the same weight afforded to that of a medical professional. Lincoln's employees' reliance on the opinions of Mr. Harris's medical providers over his own declaration statement was reasonable. Thus, Mr. Harris's contention, with regards to his own declaration, has little bearing on whether Lincoln had reasonable grounds to support its decision.

Thus, even if the *de novo* review of Lincoln's decision demonstrated that Lincoln's decision was wrong, other reasonable grounds supported Lincoln's decision. Nevertheless, the Court finds that Lincoln's determination of benefits was not wrong, but rather it was *de novo* correct. As such, summary judgment is due to be granted in Lincoln's favor and due to be denied in Mr. Harris's favor on this claim.

## B. Mr. Harris's Claim for Wrongful Withholding of Documents

The Court analyzes Mr. Harris's second claim that Lincoln wrongfully withheld documents related to the Lincoln's denial of the dismemberment claim. This claim requires a different standard of review (than the *Blankenship* test); it is the classic Federal Rule of Civil Procedure 56 standard, that the Court sets forth below.

### i. Standard of Review for the Claim of Wrongfully Withholding Documents[22]

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact, a party must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering a motion for summary judgment, the Court must view the evidence in the record in the light most favorable to the non-moving party

---

[22] The typical summary judgment has been set forth as the standard of review in another case in this Court that examined a summary judgment motion regarding a claims brought pursuant to 29 U.S.C. §1132(c). *See Young v. UnitedHealth Group Life Ins. Plan.*, No. 2:13-CV-1738-VEH, 2014 WL 5519974, at *1-2 (N.D. Ala. Oct. 31, 2014) (Hopkins, J.).

and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

The filing of cross motions for summary judgment does not alter the Rule 56 standard. *See United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984) ("Cross motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.").

### ii. Analysis

Lincoln argues that summary judgment should be granted in its favor on Mr. Harris's second claim, because: the claim applies only to plan administrators, and Lincoln is not the plan administrator; (ii) the claim does not apply to the types of documents at issue here; and (iii) even if the claim was applicable to Lincoln and the types of documents at issue, Lincoln acted diligently and in good faith, and its actions should not be penalized. (Doc. 40, p. 49.)

Mr. Harris, however, argues that: "(1) Lincoln is designated under the plan as an administrator with sole authority 'to establish and enforce procedures to administer the Policy and claims under it' and (2) alternatively, Lincoln is clearly a *de facto* administrator under the Eleventh Circuit." (Doc. 51, p. 30.)

The relevant statute governing Mr. Harris's claim provides:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this

subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. §1132(c). An "administrator" is:

(i) the person specifically so designated by the terms of the instrument under which the plan is operated;

(ii) if an administrator is not so designated, the plan sponsor; or

(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. §1002(16)(A)(1).

The Eleventh Circuit has adopted the *de facto* plan administrator doctrine. *Rosen v. TRW, Inc.*, 979 F.2d 191, 194-94 (11th Cir. 1992). In *Rosen*, the Eleventh Circuit held that: "if a company is administrating the plan, then it can be held liable for ERISA violations, regardless of the provisions of the plan document." *Id.* at 193-194. The Eleventh Circuit, however, declined to apply the doctrine to third-party claims administrators. *Oliver v. Coca-Cola Co.*, 497 F.3d 1181 (11th Cir. 2007), *vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007), *aff'd in part and remanded in part*, 546 F.3d 1353 (11th Cir. 2008). In *Oliver*, the Eleventh Circuit stated that it had rejected application of the doctrine to third-party

administrative services providers, as opposed to employers. *Id.* at 1194; *see also Smiley v. Hartford Life & Accident Ins. Co.*, 610 Fed.App'x 8, 8-9 (11th Cir. 2015) ("We have consistently rejected the use of the de facto plan administrator doctrine 'where a plaintiff has sought to hold a third-party administrative services provider liable, rather than the employer . . . .'" (quoting *Oliver*, 497 F.3d at 1194)).

The Polices designate QinetiQ as the plan administrator. AR 000107; AR 000166. Accordingly, QinetiQ is the "the person specifically so designated by the terms of the instrument under which the plan is operated[,]"29 U.S.C. §§1002(16)(A)(1)(i), and is the Plan Administrator.

Mr. Harris argues that the statute applies to Lincoln, because the Policies, in the sections titled "Company's Discretionary Authority," grants "authority to administer the plan" to Lincoln. (Doc. 51, p. 32.) Mr. Harris's assertion is a mischaracterization of the Policies. The Policies grant Lincoln authority to administer "claims." Thus, his argument, premised on a misrepresenting the Policies' terms, lacks merit.

Mr. Harris argues that Lincoln is the Plan Administrator, because "[o]nly Lincoln has the authority to establish and enforce procedures for administering the policies . . . ." (Doc. 51, p. 32.) Mr. Harris fails to prove or even attempt to demonstrate the argument's underlying assumption that "only" Lincoln has this authority. The Court need not search the record to find evidence to support Mr.

Harris's claim for him. Given that the argument is premised on an unproven assumption, Mr. Harris's argument lacks persuasive force. Regardless, even if Mr. Harris had proven this assumption, Section 1002(16)(A)(1) does not define an "administrator" as someone with sole authority over establishing and enforcing policy administration procedures.

Mr. Harris argues that the Summary Plan Description information is inapplicable because: "The policies are the instruments that govern the operation of the Plans the [Summary Plan Descriptions]'s expressly state so." (Doc. 51, p. 32 (citing AR 000107; AR 000166).) The Summary Plan Descriptions state: "This Summary Plan Description is only intended to provide an outline of the Plan's benefits. The Plan Document will govern if there is any discrepancy between the information contained in this Description and the Plan." AR 000107; AR 000166. Mr. Harris fails to identify any discrepancy in the plan documents with regards to the identification of the Plan Administrator that would make the identification of QinetiQ as Plan Administrator inapplicable or questionable.

Mr. Harris also argues that the Summary Plans Descriptions "create an issue as to whether more than one person has been designated as an administrator . . . ." (Doc. 51, p. 32-33.) He relies on language in the Summary Plan Descriptions that state: "The Lincoln National Life Insurance Company has the sole discretionary authority to determine eligibility and to administer claims in accord with its

interpretation of the policy provisions on the Plan Administrator's behalf." (*Id.* (citing AR 000107; AR 000166).) Mr. Harris has not cited any authority for the proposition that Lincoln's determination and eligibility and administration of claims makes Lincoln the Plan Administrator especially in this context where the Plan Administrator has been designated as QinetiQ. In essence, Mr. Harris is arguing that this policy language makes Lincoln a *de facto* plan administrator. But, that argument fails because Lincoln is not Mr. Harris's employer and the *de facto* plan administrator doctrine only applies to employers. *See Oliver*, 497 F.3d at 1194.

Mr. Harris makes another variation of the *de facto* plan administrator argument stating that: "Lincoln's exclusive control over the policies and the payment of benefits when coupled with its financial responsibility clearly support the finding that Lincoln is a *de facto* administrator." (Doc. 51, p. 34-36; *see also* Doc. 51, p. 37 (arguing that QinetiQ is a "nominal administrator").) This argument also fails for the same reason that the *de facto* plan administrator doctrine only applies to employers. *See Oliver*, 497 F.3d at 1194.

Mr. Harris also claims that *Oliver* supports its position that Lincoln could be found to be a Plan Administrator in this context. (Doc. 51, p. 36-37.) Mr. Harris describes the significance of *Oliver* as follows:

> Significantly, the court reasoned that the activities[, the third-party claims administrator,] Broadspire engaged in are activities supporting

a finding of *de facto* administrator status under *Hamilton*[ *v. Allen-Bradley Co.*, 244 F.3d 819 (11th Cir. 2001)] but that Broadspire lacked the requisite level of control over the plan to be deemed a *de factor* [sic] administrator.

(Doc.51, p. 37.) Mr. Harris presents the Court with an incorrect proposition of law and fails to address subsequent applicable legal authority that described this case's holding as contrary to the one that Mr. Harris presents. *See Smiley*, 610 Fed.App'x at 8-9 ("We have consistently rejected the use of the de facto plan administrator doctrine 'where a plaintiff has sought to hold a third-party administrative services provider liable, rather than the employer . . . .'" (quoting *Oliver*, 497 F.3d at 1194)). *Oliver* does not stand for the proposition that a third-party claims administrator with a certain threshold of control over a plan is deemed a *de facto* administrator. *See Oliver*, 497 F.3d at 1195.[23] On the contrary, the *Oliver* Court

---

[23] The *Oliver* Court stated as follows:

> Were we to find Broadspire a *de facto* plan administrator on these facts, we would undercut the ability of employers to contract out the administrative tasks associated with operating an ERISA plan, a practice we upheld in *Baker* [*v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288 (11th Cir. 1989)]. *See id.* at 290. Indeed, it is hard to imagine how an administrative services provider could fulfill its functions without engaging in the types of activity that, in *Hamilton*, triggered the application of the *de facto* administrator doctrine. *See Hamilton*, 244 F.3d at 824 (finding that employer was *de facto* administrator because, *inter alia*, it distributed disability benefit application forms and "field[ed] questions about the plan from employees"). The First Circuit, which also recognizes the *de facto* administrator doctrine in some contexts, *see Law v. Ernst & Young*, 956 F.2d 364, 372–73 (1st Cir. 1992), has also declined to apply the *de facto* administrator doctrine to a third party administrative services provider in circumstances similar to those here. *See Terry v. Bayer Corp.*, 145 F.3d 28, 35 (1st Cir. 1998) ("[W]hen the plan administrator retains discretion to decide disputes, a third party service provider, such as Northwestern, is not a fiduciary of the plan, and thus not amenable to a suit under [ERISA].") (citations omitted). Because Broadspire is

held, "where a plaintiff has sought to hold a third-party administrative services provider liable, rather than the employer, we have rejected the *de facto* plan administrator doctrine." *Id.* (emphasis in original). The Court explained that holding a third party administrator to be a *de facto* plan administrator would "undercut the ability of employers to contract out the administrative tasks associated with operating ERISA plan . . . ." *Oliver*, 497 F.3d at 1195.

The Court finds that with respect to Mr. Harris's claim pursuant to 29 U.S.C. §1132, summary judgment is due to be granted in favor of Lincoln and denied with respect to Mr. Harris, because the claim should be directed to the Plan Administrator and Lincoln is not the Plan Administrator or a *de facto* plan administrator.

---

merely an administrative services provider, and because, under the Plan, Coca–Cola, through the Committee—not Broadspire—makes the final decision on benefits claims, we are bound by *Baker* to hold that Coca–Cola is the plan administrator. *See Baker*, 893 F.2d at 289–90.

*Oliver*, 497 F.3d at 1195 (first bracket added, other brackets in original).

## V.    CONCLUSION

For the reasons stated above, Lincoln's Motion for Summary Judgment (Doc. 12) is **DENIED** as superseded, Lincoln's Reformatted Motion for Summary Judgment (Doc. 40) is **GRANTED,** and Mr. Harris's Motion for Summary Judgment (Doc. 28) is **DENIED**.

**DONE** and **ORDERED** this February 7, 2019.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE